UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CARLOS PADILLA ROMERO,

    Petitioner,

            Case No. 26-cv-875-pp

  v.

SECRETARY MARKWAYNE MULLIN,
SAMUEL OLSON, ACTING USAG TODD BLANCHE,
DIRECTOR OF ICE TODD M. LYONS
and SHERIFF DALE J. SCHMIDT,

    Respondents.

**ORDER GRANTING *HABEAS* PETITION, DENYING REQUEST FOR ATTORNEY FEES (DKT. NO. 1) AND CLOSING CASE**

The petitioner, who is represented by counsel, came to the United States with his grandfather in 2006 when he was eleven years old. Dkt. No. 1 at ¶2. He graduated from high school in Wisconsin, married a United States citizen, works in the United States and is the father of two United States citizen children. Id. Immigration authorities took him into ICE custody on April 30, 2026 and initiated removal proceedings. Id. at ¶¶3, 4; Dkt. No. 6 at 1; Dkt. No. 7-1. The petitioner has been held in the Dodge County Detention Center without an individualized bond hearing. Dkt. No. 1 at ¶4.

The petitioner filed a petition for writ of *habeas corpus* under 28 U.S.C. §2241 seeking an order for release or, alternatively, a prompt individualized bond hearing under 8 U.S.C. §1226(a). The court screened the petition and ordered the respondent to show cause why the petition should not be granted.

1

On July 17, 2026, the respondents filed their response and the declaration of Assistant United States Attorney Stuart Gilgannon. Dkt. Nos. 6, 7. For the reasons explained in this order, the court will grant the petition and order the respondents to afford the petitioner a bond hearing or, if they cannot comply with that order, to release him under reasonable conditions of supervision. The petitioner also has filed a motion for leave to file a reply to the response. Dkt. No. 8. Because the court is granting the petition, it will deny that motion as moot.

## I.      Background

The petitioner is a citizen of Mexico, whose mother left when he was five. Id. at ¶22. He never met his father. Id. His grandfather brought him to the United States in 2006 without inspection at the border. Id. at ¶23. The petitioner says that he never applied for Deferred Action for Childhood Arrivals because he lacked the necessary paperwork and had no family members in Mexico capable of assisting him. Id. at ¶26. The petitioner continuously has resided in Wisconsin since, and graduated from Shiocton High School in 2012. Id. at ¶25. He married Maria Padilla, a United States citizen, and together they have two children under the age of three. Id. at ¶29. The petitioner says that he bears the primary responsibility of providing financially for his family. Id. at ¶30. He works for his brother's company and is paid through the payroll. Id. at ¶31. The petitioner has extensive family in the United States, no support system in Mexico and no criminal convictions. Id. at ¶¶32-36.

2

After taking the petitioner into custody, the Department of Homeland Security charged the petitioner as inadmissible under 8 U.S.C. §1182(a)(6)(A)(i) for entering the United States without inspection. Id. at ¶¶38-40.

## II. The Petition

### A. Jurisdiction

A federal court may issue a writ of *habeas corpus* when the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §2241(c)(3). A petitioner may file a petition under §2241 to challenge detention orders in immigration proceedings. Zadvydas v. Davis, 533 U.S. 678, 688 (2001).

This court agrees with the other judges in this district who have decided that federal district courts have jurisdiction to consider such petitions in immigration proceedings if "the petitioner is not asking the court to review a removal order, the decision to initially detain him or seek his removal, or any part of the process by which his eligibility for removal will be determined." Ramirez Valverde v. Olson, Case No. 25-cv-1502, 2025 WL 3022700, at *1 (E.D. Wis. Oct. 29, 2025), appeal filed December 23, 2025 (citing Jennings v. Rodriguez, 583 U.S. 281, 294 (2018)). "Title 8, United States Code, Sections 1252(a)(2)(B)(ii), (b)(9), and (g), do not deprive a federal district court of jurisdiction to consider challenges to a person's detention pending removal." Id. (citing H.G.V.U. v. Smith, Case No. 25 CV 10931, 2025 WL 2962610, at *2-3 (N.D. Ill. Oct. 20, 2025)). See also, Cirrus Rojas v. Olson, Case No. 25-cv-1437, 2025 WL 3033967, at *3-4 (E.D. Wis. Oct. 30, 2025), appeal filed Nov. 25, 2025

(citations omitted) (Judge Ludwig); <u>Lopez De La Cruz v. Schmidt</u>, Case No. 25-cv-1562, 2025 WL 5095296, at *2-3 (E.D. Wis. Nov. 19, 2025) (Judge Adelman); <u>Ugarte-Arenas v. Olson</u>, Case No. 25-C-1721, 2025 WL 3514451, at *3 (E.D. Wis. Dec. 8, 2025), appeal filed January 7, 2026 (Judge Griesbach).

      B.     <u>The Parties' Arguments</u>

          1.     *§2241 Petition* (Dkt. No. 1)

The petitioner argues that his continued detention without eligibility for an individualized bond hearing violates the Immigration and Naturalization Act (INA) and the Due Process Clause of the Fifth Amendment. Dkt. No. 1 at ¶¶86-101. He argues that he is not subject to mandatory detention under 8 U.S.C. §1225(b)(2) because he entered the United States approximately twenty years ago as a child and was apprehended within the interior of the country. <u>Id.</u> at ¶88. The petitioner argues that he falls under 8 U.S.C. §1226(a), which requires an individual custody determination regarding danger and flight risk. <u>Id.</u> at ¶91. He asserts that his continued detention violates the INA because the respondents have not provided him with a meaningful bond hearing. <u>Id.</u> at ¶93.

The petitioner contends that his detention violates his Fifth Amendment right to due process of law. <u>Id.</u> at ¶95. He says that he has been detained for a significant period without any individualized determination and that he neither presents a danger to the community nor a risk of flight. <u>Id.</u> at ¶97. Applying the three-part test articulated in <u>Matthews v. Eldridge</u>, 424 U.S. 319 (1976), the petitioner says that the risk of erroneous deprivation of his liberty interest is exceptionally high because the respondents have categorically denied him any

4

bond hearing based on their incorrect determination of the INA. Id. at ¶98. He argues that his extensive family ties, lack of criminal convictions, stable employment history and longstanding residence demonstrate that the individualized procedures would substantially reduce the risk of an erroneous decision. Id. at ¶99. He adds that the government possesses only a minimal interest in denying him a bond hearing where §1226(a) provides an established framework for such determination. Id. at ¶100.

      2.    *Response* (Dkt. No. 6)

Although acknowledging "that the Court of Appeals and judges within this District have split on the issue," the respondents argue that the statutory text and legislative history "strongly support the conclusion that the Petitioner is subject to mandatory detention." Dkt. No. 6 at 4. They assert that the petitioner is an "applicant for admission" under 8 U.S.C. §1225(a) because he is present in the United States and has not been lawfully admitted. Id. The respondents argue that the phrases "applicant for admission" and "seeking admission" found in §1225(b)(2)(A) are synonymous. Id. at 5. They cite the Fifth Circuit Court of Appeals decision in Buenrostro-Mendez v. Bondi, 166 F.4th 494, 502-503 (5th Cir. 2026) for its holding that the words "apply" and "seek" similarly mean "to request" something. Id. The respondents reason that because the phrase "applicant for admission" is synonymous with "seeking admission," anyone found in the country who lacks legal immigration status is subject to mandatory detention pending removal proceedings. Id. at 6.

The respondents argue that the legislative history leads to the same conclusion. Id. at 7. They say that before the passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, the INA provided only for inspection of foreign nationals when they arrived at ports of entry. Id. Those individuals were placed in exclusion proceedings and subject to mandatory detention; individuals found in the United States at a later date were placed in deportation proceedings and subject to bond. Id. (citing former 8 U.S.C. §1182(d)(5)(1994) and 8 U.S.C. §1252(a)(1)(1994)). The respondents maintain that Congress intended to eliminate this discrepancy by enacting §1225(a)(1) to "ensure[ ] that all immigrants who have not been lawfully admitted, regardless of their physical presence in the country, are placed on equal footing in removal proceedings." Id. at 7-8 (citing Avila v. Bondi, 170 F.4th 1128, 1135-36 (8th Cir. 2026) (quoting Torres v. Barr, 976 F.3d 918, 928 (9th Cir. 2020); Moran Rayo v. Olson, Case No. 25-cv-2064-bhl, 2026 WL 594079, *4 (E.D. Wis. Mar. 3, 2026)).

As for the petitioner's due process arguments, the respondents say that unadmitted aliens have no fundamental right to remain at liberty during their removal proceedings. Id. at 9. They argue that the petitioner has been detained less than three months and already has received a final adjudication on the merits of all applications for relief from removal by an immigration judge. Id. at 9. He has thirty days to appeal. Id. at 9. The respondents explain that the petitioner can secure his release by not objecting to removal. Id. at 10. They

6

assert that the petitioner has no substantive right not to be detained pending the conclusion of his removal proceedings. Id. at 10.

To the extent that the petitioner is asserting a procedural due process right, the respondents argue that the Matthews balancing test is inapplicable because a hearing would serve no purpose. Id. at 11. They argue that even if Matthews is applied, the petitioner has the liberty to live in his own native land. Id. They say that the probability of error is minimal because the petitioner concedes that he entered the country without inspection. Id. And they assert that the government has a significant interest in making sure that the removal occurs. Id.

Assistant United States Attorney Stuart Gilgannon filed a declaration in support of his response to the order to show cause, and attached a copy of Form I-213 (Record of Deportable/Inadmissible Alien), dkt. no. 7-1; Form I-862 (Notice to Appear), dkt. no. 7-2; a June 23, 2026, order denying the petitioner's bond request for lack of jurisdiction, dkt. no. 7-3; and a June 30, 2026 order of removal, dkt. no. 7-4. The petitioner has thirty days to appeal before the removal order becomes final. See 8 C.F.R. §1003.6(a).

C.  Discussion

1.  *Seventh Circuit Precedent*

Petitioners in this district and across the country have been filing petitions under 28 U.S.C. §2241, asking courts to consider the two statutes that govern the detention and removal of noncitizens: 8 U.S.C. §§1225 and 1226. Most of these petitions ask the court to decide whether the petitioner is

7

eligible for release on bond while removal proceedings are pending. Section 1226 provides for the discretionary release of noncitizens on bond; §1225 requires detention with no opportunity for release on bond. Until early May 2026, the Seventh Circuit had not addressed the issue. And because the court's May 5, 2026 decision in <u>Castañon-Nava v. United States Dept. of Homeland Security</u>, 175 F.4th 828 (7th Cir. 2026) is a split decision, arguably the court has not yet "ruled" on it.

The factual background of <u>Castañon-Nava</u> was different from the factual background in this case. The author of the majority opinion, Judge John Lee, explained:

> In 2018, Plaintiffs filed this suit against the Department of Homeland Security and the U.S. Immigration and Customs Enforcement ("Defendants"), alleging that they violated 8 U.S.C. § 1357(a)(2) by arresting noncitizens without reason to believe that they were likely to escape before warrants could be obtained. To resolve the lawsuit, in 2022, Defendants and Plaintiffs entered into a Consent Decree that was negotiated over the course of two different administrations. In it, Defendants agreed, among other things, to comply with § 1357(a)(2) when making warrantless arrests and issue a "Broadcast Statement of Policy" affirming "the underlying laws and policies applicable to all arrests effected under 8 U.S.C. § 1357(a)(2)." Dkt. 155-1 at 5, 6, 17.

> In exchange, Defendants obtained a dismissal with prejudice and release of all related claims, "avoid[ing] the substantial expense, inconvenience, and distraction of further protracted litigation ... and finally put[ting] to rest and terminat[ing]" the action. Id. at 2. Defendants do not challenge the validity of the original Consent Decree or the authority of the district court to enter it.

> Instead, Defendants appeal two orders the district court entered on October 7, 2025, and November 13, 2025. As to the former, Defendants object to the district court's decision to extend the Consent Decree by 118 days due to Defendants' substantial noncompliance with its terms. As to the latter, Defendants take issue with the district court's order that they release 13 class

8

members, as well as approximately 200 additional individuals, whose arrests (in the district court's words) "potentially" violated § 1357(a)(2).

In December 2025, Defendants filed a motion to stay the orders pending appeal, which we denied in part and granted in part. See Castañon-Nava v. U.S. Dep't of Homeland Sec., 161 F.4th 1048 (7th Cir. 2025). After the benefit of full briefing and oral argument, we now affirm the October 7 order's 118-day extension of the Consent Decree and affirm in part and reverse in part the November 13 order.

Castañon-Nava, 175 F.4th at 833-34 (footnotes omitted).

In Castañon-Nava, the government argued that 8 U.S.C. §1252(f)(1) grants only the Supreme Court the authority to restrain the operation of immigration laws via classwide injunctive relief. Id. at 836. It argued that this "bar" on classwide injunctive relief in immigration enforcement barred the district court from extending the consent decree. Id. at 836-37. That is not an issue in this case. This case involves an individual petitioner, not a member of a class.

In Castañon-Nava, the issue of whether a petitioner was entitled to a release hearing under §1225 or §1226 arose because the district court had ordered thirteen individuals to be released on the ground that they were arrested in violation of the consent decree. Id. at 842. The defendants asserted that that order violated §1252(f)(1) because it "restrict[ed] the government's ability to detain noncitizens pursuant to its authority under §1225(b)(2)(A) and §1226(a)." Id. at 842. Judge Lee acknowledged that his colleagues—Judge Doris Pryor and Judge Thomas Kirsch—believed that the court should not reach the interpretation of those two statutes "because § 252(f)(1) proscribes our ability in this case to assess whether § 1225(2)(A) applies in the first

9

instance." Id. at 843. Judge Lee didn't agree and explained why. Id. at 843-44. He then went on to address "the dispute at hand," which he described as "whether §1225(b)(2)(A) applies to noncitizens who are unlawfully within the United States as well as those who present themselves at its borders and ports of entry." Id. at 144. Judge Lee concluded—based on the statutory language of §1225(b)(2)(A), its statutory context, its history and background and the government's historical practice and understanding—that §1225(b)(1)(A) "applies to 'applicants for admission' who are seeking lawful entry at the border or ports of entry and not to noncitizens unlawfully living in the country's interior." Id. at 856.

If all three panelists—Judge Lee, Judge Pryor and Judge Kirsch—had agreed both to reach the question of the government's interpretation of §1225(b)(1)(A) and on the interpretation of it, the Castañon-Nava decision would have ended this court's analysis. But they did not. Judge Pryor concurred in the portion of Judge Lee's ruling finding that the government had "waived reliance on 8 U.S.C. § 1252(f)(1)'s bar on classwide injunctive relief when they entered the Consent Decree and that the district court did not abuse its discretion in extending the Consent Decree's terms due to Defendants' substantial noncompliance." Id. at 857. But she did not join the portion of Judge Lee's opinion that analyzed the government's interpretation of §1225(b)(2)(A); she opined that the defendants had waived that argument, and that if they hadn't, the bar on classwide injunctions would have prevented the district court from reaching the issue. Id. And Judge Kirsch dissented, both as

10

to Judges Lee and Pryor's conclusion regarding the government's waiver of the classwide injunctive relief argument and as to Judge Lee's interpretation of §1225. <u>Id.</u> at 863-64.

What is a lower court to do with such a split decision? In <u>Marks v. United States</u>, 430 U.S. 188, 193 (1977), the Supreme Court stated, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" (quoting <u>Gregg v. Georgia</u>, 428 U.S. 153, 169 n.15 (1976)). In 2021, the Seventh Circuit considered this guidance:

> In recent decades, plurality decisions have become more frequent, especially on some of the most controversial issues the federal courts face. Lower courts have tried to follow the Marks instruction in a variety of scenarios, and scholars and lower courts have identified several distinct models for applying Marks.
>
> A helpful guide comes from Professor Ryan Sullivan:
>
>> The first of these approaches interprets *Marks* as limited to a narrow subset of plurality decisions reflecting a clearly discernable "implicit consensus" or "common denominator" among justices. The second approach understands *Marks* as an instruction to lower courts to identify the opinion in a plurality decision that reflects the judgment-critical vote— typically the fifth concurring vote—and treat that opinion as the Court's holding. The third and final approach looks for points and majority consensus among different factions of concurring and dissenting Justices on distinct legal issues raised by the plurality decision.
>
> Ryan Williams, *Questioning Marks: Plurality Decisions and Precedential Constraints*, 69 Stan. L. Rev. 795, 806-07 (2017).

Planned Parenthood of Ind. and Ky., Inc. v. Box, 991 F.3d 740, 743-44 (7th Cir. 2021). The court went on to say that the first model—the "common denominator" model—is "predominant in precedent." Id. at 744.

Assuming that the "narrowest ground" rule also serves as a guide to district courts attempting to apply fragmented Seventh Circuit decisions, the court has tried to apply the "common denominator" model to the Seventh Circuit's decision in Castañon-Nava. In doing so, it concludes that the "narrowest ground" on which concurring members of the panel agreed was the conclusion that the Department of Homeland Security and U.S. Immigration and Customs Enforcement had waived their ability to rely on §1252(f)(1)'s bar on classwide injunctive relief when they entered into the consent decree and that the district court hadn't abused its discretion in extending that decree. That is the only ground on which two of the three members of the Castañon-Nava panel agree. It does not appear, therefore, that there is binding precedent from the Seventh Circuit regarding the competing interpretations of §1225(b)(2)(A) that the parties put forward here.

  2. *This Court's Analysis*

"As with all questions of statutory interpretation, we start with the text of the statute to ascertain its plain meaning." United States v. Melvin, 948 F.3d 848, 851 (7th Cir. 2020) (quoting Jackson v. Blitt & Gaines, P.C., 833 F.3d 860, 863 (7th Cir. 2016)).

> In ascertaining a statute's plain meaning, we "must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 . . . (1988). Unless words are otherwise defined, they

12

> "will be interpreted as taking their ordinary, contemporary, common meaning." *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 . . . (2014) (quoting *Perrin v. United States*, 444 U.S. 37, 42 . . . (1979)). We find words' ordinary, contemporary, common meaning by looking at what they meant when the statute was enacted, often by referencing contemporary dictionaries. *Jackson*, 833 F.3d at 863. If the statutory language's plain meaning is unambiguous, our inquiry ends there. *See River Rd. Hotel Partners, LLC v. Amalgamated Bank*, 651 F.3d 642, 649 (7th Cir. 2011).

Id. at 851-52. And the court must read the statute in a way to give effect to all provisions, "so that no part will be inoperative or superfluous, void or insignificant." Corley v. United States, 556 U.S. 303, 314 (2009).

The respondents assert that the petitioner is deemed to be an "applicant for admission" under 8 U.S.C. §1225(a)(1) because he never was lawfully admitted into the United States. Dkt. No. 6 at 4. In other words, they argue that all noncitizens are subject to mandatory detention. But the title of §1225 is, "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing." It specifically references "arriving aliens"—not "all" aliens or "aliens" without a modifier. Although a statute's title cannot override the plain text of a statute, the Supreme Court has "long considered that the 'title of a statute and the heading of a section' are 'tools available for the resolution of a doubt.'" See Dubin v. United States, 599 U.S. 110, 120–21 (2023) (quoting Almendarez-Torres v. United States, 523 U.S. 224, 234 (1998)).

Subsection (a)(1) of §1225 defines "applicant[s] for admission" as

> [a]n alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission.

13

"Admitted" is defined elsewhere in Title 8 as the "lawful entry . . . into the United States after inspection and authorization by an immigration officer." 8 U.S.C. §1101(a)(13)(A). Section 1225 explains that "all aliens (including alien crewman) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers." 8 U.S.C. §1225(a)(3).

That is §1225(**a**)(1). There is a separate track under §1225(**b**)(1) for processing arriving aliens and "certain other aliens who have not been admitted or paroled." This includes those who are inadmissible due to fraud, misrepresentation or lack of valid documentation; those whom an officer determines are inadmissible and seeking asylum; and other aliens who receive special designation by the Attorney General. 8 U.S.C. §1225(b)(1)(A)(i)-(iii)). Applicants for admission covered by §1225(b)(1) are removed "without further hearing or review" under an expedited removal process, unless the alien "indicates either an intention to apply for asylum . . . or a fear of persecution," in which case that alien is referred for an asylum interview. 8 U.S.C. §1225(b)(1)(A)(i)-(ii).

Important to the resolution of this dispute, §1225(b)(2) applies to all "applicants for admission" not covered by §1225(b)(1). Section 1225(b)(2) states that "in the case of an alien who is an **applicant for admission**, if the examining immigration officer determines that **an alien seeking admission** is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." 8 U.S.C.

14

§1225(b)(2)(A) (emphasis added). The phrase "seeking admission" is not defined by statute, but "seeking" is the present participle of the verb "seek;" it implies a present action. "Admission" is defined as a request for lawful entry after inspection and authorization. See 8 U.S.C. §1101(a)(13)(A). Read as a whole, §1225(b)(2) requires mandatory detention of a noncitizen who presently is seeking entry but whom the immigration officer has determined is not clearly entitled to be admitted.

In contrast, §1226 is titled "Apprehension and detention of aliens." That section states that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. §1226(a). While that decision is pending, the Attorney General may "continue to detain the arrested alien," "release the alien on bond of at least $1,500" or "release the alien on conditional parole." 8 U.S.C. §§1226(a)(1)-(2). An immigration officer authorized to issue an arrest warrant may release an alien if the alien demonstrates that he does not pose a danger to property or persons and that he is likely to appear for future proceedings. 8 C.F.R. §1236.1(c)(8). After the district director makes the initial custody determination (including the setting of a bond), the alien may seek "amelioration" of release conditions, and prior to any final order, an immigration judge may detain the alien, release him or set a bond. 8 C.F.R. §1236.1(d)(1). The Attorney General may revoke bond or parole, and may rearrest and detain the alien "under the original warrant." 8 U.S.C. §1226(b). The United States Supreme Court has referred to §1226 as the "default rule"

15

for arresting and detaining aliens "already present in the United States" pending removal. Jennings, 583 U.S. at 303.

There is an exception under §1226(c) that requires the detention of persons "who fall[ ] into one of the enumerated categories involving criminal offenses and terrorist activities." Jennings, 583 U.S. at 303; 8 U.S.C. §1226(c)(1)(E)(i)-(ii). These individuals are not entitled to a bond hearing and may be released under very limited circumstances. 8 U.S.C. §1226(c)(4). Congress recently amended §1226 to include in this section any alien who has been "charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or bodily injury to another person." Laken Riley Act, Pub. L. No. 119-1, §2, 139 Stat. 3, 3 (2025). Giving effect to both §1225 and §1226, the United States Supreme Court has offered the following guidance:

> U.S. immigration law authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings under §§ 1226(a) and (c).

Jennings, 583 U.S. at 289.

Relying on the plain language of both statutes, and giving meaning to all of the language of both statutes, the court concludes that the petitioner falls under the ambit of §1226. The petitioner is a noncitizen awaiting a decision regarding his removal. He already was in the country at the time of his April

16

30, 2026 arrest. He was not seeking admission into the country at a border or port of entry, nor was he seeking admission after inspection. He does not appear to fall within one of the enumerated categories involving criminal offenses and terrorist activities, and the respondents have not made such an argument.

In the three decades prior to 2025, this petitioner—a noncitizen who'd been living in the country for twenty years—would have been entitled to a bond hearing under §1226. In 2025, however, the Department of Homeland Security implemented a new policy amounting to a conclusion that prior administrations, the agency and the courts had been misinterpreting the language of §1226 for those three decades. The agency now treats everyone who has entered the United States illegally as an applicant for admission under §1225(a)(1) regardless of how long that person has been present in the United States or how far they are found from the border. The Board of Immigration Appeals gave force to that policy by holding that immigration judges lacked the authority to consider requests to release on bond persons who entered the country without inspection. Yajure Hurtado, 29 I. & N. Dec. at 229. But the respondents' reading of the statute classifying every noncitizen as an "applicant for admission" renders superfluous the language in §1226(c)(1) and cannot be squared with the text of the statute or the facts of this case.

In his opinion in Castañon-Nava, 175 F.4th at 848-56, Judge Lee looked beyond the plain language of the statute. He considered the statutory context, the legislative history and the thirty years during which the executive branch

17

had interpreted §1225(b)(2)(A) as applying only to applicants for admission seeking entry at borders or entry ports. He summarized his holding:

> [T]he text, statutory context, legislative history, and long-standing Executive practice all confirm that § 1225(b)(2)(A) applies to 'applicants for admission' who are seeking lawful entry at the border or ports of entry and not to noncitizens unlawfully living in the country's interior. Given the statute's history, it is unreasonable to think that Congress in 1996 intended to subject millions of noncitizens to mandatory detention in the oblique, off-handed fashion that the Defendants claim. Thus, Defendants lacked the authority in the first instance to place the individuals at issue, all of whom were already within the United States, under mandatory detention pursuant to § 1225(b)(2)(A).

Id. at 856.

As this court has explained, the precedential impact of this conclusion, given that Judges Pryor and Kirsch did not join it, is unclear. But a week before the final judgment in Castaño-Nava, a panel of the Second Circuit issued a decision in Barbosa Da Cunha v. Freden, 175 F.4th 61 (2d Cir. 2026). All three members of that panel reached the conclusion reached by Judge Lee, but additionally opined that the government's interpretation raises grave constitutional concerns:

> . . . Petitioner is protected by the Fifth Amendment's Due Process Clause, requiring any civil detention to be "nonpunitive in purpose and effect." *Zadvydas*, 533 U.S. at 690 . . .; *see also Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020) ("[T]he Due Process Clause covers noncitizens, whether their presence here is lawful, unlawful, temporary, or permanent."). While noncitizens can be detained temporarily to "give[ ] immigration officials time to determine an alien's status without running the risk of the alien's either absconding or engaging in criminal activity," *Jennings*, 583 U.S. at 286 . . . that is not what is going on here, where detention is mandatory regardless of these risks. We discern no basis for subjecting all noncitizens in Petitioner's shoes to categorical detention without bond. As the government conceded at oral argument, Petitioner, like many unlawfully present noncitizens,

18

presents no risk of flight nor any danger to the community. Indeed, when ordered by the district court to provide Petitioner with a bond hearing, the Agency agreed that he presented no such risks and released him.

The government's interpretation would also likely subject Petitioner to unconstitutionally prolonged detention. Before he was arrested, Petitioner's asylum application was pending for nearly a decade, and it still has not been resolved. And while the government represents that removal is "practically attainable" for Petitioner, Appellant's Reply Br. at 32, proceedings have already lasted more than six months since his arrest with no clear end in sight. In fact, his next hearing is scheduled for June 28, 2027. *See EOIR Automated Case Info., Exec. Off. for Immigr. Rev.*, https://acis.eoir.justice.gov/en (search by 209 454 653, Brazil, or access an archived version at https://perma.cc/257V-4KT2) (last visited Apr. 27, 2026). Detaining Petitioner without a bond hearing until then would "raise[ ] serious due process concerns" under our precedents. *Black [v. Decker]* 103 F.4th [133] at 150 (2d Cir. 2024)]; *see Velasco Lopez*, 978 F.3d at 855 (holding that continued detention of a noncitizen under Section 1226(a) for fifteen months pending removal violated due process).

These concerns are compounded by the fact that noncitizens have no right to counsel and are therefore often unrepresented in removal proceedings. *See* 8 U.S.C. § 1229a(b)(4)(A). Unlike criminals detained for punitive purposes, noncitizens like Petitioner thus lack the ability to reliably challenge their detention or the conditions in which they are being held.

Id. at 94. Although the Second Circuit's decision is not binding on this court, the court shares the Second Circuit's concerns.

The court acknowledges that the Fifth and Eighth Circuits have endorsed the respondents' position with respect to §1225(b)(2)(a). See Buenrostro-Mendez, 166 F.4th at 498; Avila, 170 F.4th at 1128. But the court finds more persuasive the petitioner's reasoning, as well as that of the Second Circuit, in finding that §1225(b)(2)(A) applies to those noncitizens who are applicants for admission and seeking admission at the border or port of entry, and that

19

§1226 applies to those noncitizens arrested in the interior of the country. The Sixth and Eleventh Circuits similarly have rejected the government's interpretation of 8 U.S.C. §1225(b)(2)(A) and have found that the mandatory detention provision applies to those seeking admission at the border. Lopez-Campos v. Raycraft, 175 F.4th 713, 732 (6th Cir. 2026); Hernandez Alvarez v. Warden, 175 F.4th 1258, 1276 (11th Cir. 2026). The court remains convinced that its analysis of §1225(b)(2) is sound until additional guidance comes from the Seventh Circuit.

Because the petitioner was arrested almost twenty years after his entry and many miles from the border, he falls under 8 U.S.C. §1226. The court finds that his continued detention under §1225 without a bond hearing violates federal law.

In his request for relief, the petitioner has requested fees under 28 U.S.C. §2412(d), but has not filed an application as required under the Equal Access to Justice Act. 28 U.S.C. §2412(d)(1)(B). The petitioner would be entitled to fees only if the (1) government's litigation position was not substantially justified; (2) no special circumstances make an award unjust; and (3) the request is timely filed. 28 U.S.C. §2412(d)(1)(A), (B); Cunningham v. Barnhart, 440 F.3d 862, 863 (7th Cir. 2006). Given the circuit split on this issue, it is difficult to argue that the government's position was not substantially justified. See Herrera v. Olson, Case No. 25-cv-1994, 2026 WL 1602258, *2 (E.D. Wis. June 4, 2026) (finding the division within this district and across the country supports a finding that the government's position was substantially justified).

**III.  Conclusion**

The court **ORDERS** that the petition, filed under 28 U.S.C. §2241, dkt. no. 1, is **GRANTED** under the following conditions:

The court **ORDERS** that within seven days of the date of this order, the respondents must (1) afford the petitioner a bond hearing before an immigration judge under 8 U.S.C. §1226(a), at which time the government must bear the burden of justifying the petitioner's detention by proving, by clear and convincing evidence, the petitioner's dangerousness or flight risk; or (2) if the respondents cannot otherwise comply with the court's order, release the petitioner from custody under reasonable conditions of supervision.

The court **DENIES** the petitioner's request for attorney's fees. Dkt. No. 1 at 22.

The court **DENIES AS MOOT** the petitioner's motion for leave to file a reply. Dkt. No. 8.

The court **ORDERS** that this case is **CLOSED**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 24th day of July, 2026.

**BY THE COURT:**

_____

**HON. PAMELA PEPPER**
**Chief United States District Judge**

21